**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

**UNITED STATES OF AMERICA,**

v.

**DANTE LAMON TAPLIN,**

Defendant.

Case No. 3:25-cr-00040-IM-1

**OPINION AND ORDER DENYING DEFENDANT'S MOTIONS TO SUPPRESS**

**IMMERGUT, District Judge.**

A grand jury indicted Defendant Dante Lamon Taplin for being a felon in possession of a firearm. Defendant now seeks to suppress the firearm that he allegedly possessed at the time of his January 15, 2025 arrest as well as drugs and cash found on him at the time of his arrest. Before this Court is Defendant's Motion to Suppress ("Mot."), ECF 59, and Supplemental Motion to Suppress ("Supp. Mot."), ECF 70. The Government filed a Response to the motions, ECF 77, and Defendants filed a timely Reply, ECF 80. Upon a request from this Court, ECF 82, the Government provided limited supplemental briefing, ECF 86.

On September 15, 2026 and September 16, 2026, this Court held a hearing on Taplin's motions and took the motions under advisement. After reviewing the pleadings and the evidence and considering the arguments of counsel at the hearing, this Court DENIES Taplin's motion to suppress, ECF 59, and supplemental motion to suppress, ECF 70.

## BACKGROUND[1]

### A. Taplin is released on Short Term Transitional Leave, but returns to prison for violating that leave.

Beginning in August 2017, Taplin began serving a 122-month state prison sentence for the state crimes of Compelling Prostitution, Promoting Prostitution, and Delivery of a Controlled Substance. On September 25, 2023, the Board of Parole and Post-Prison Supervision approved his terms of Post-Prison Supervision ("PPS"). Exhibit 3 to Motion to Suppress ("Defense Ex. 3."), ECF 70-3 at 1. Those conditions had an expiration date of March 1, 2027. *Id.* On December 4, 2023, he was released on Short-Term Transitional Leave ("STTL"). *Id.* at 6. During his STTL, Taplin was ordered to abide by various conditions. In relevant part, Taplin was subject to the General Condition P "Gang Package," which included the condition "submit to curfew, ESP/GPS or geographic restrictions, per PO." Exhibit 5 to Motion to Suppress ("Ex. 5"), ECF 70-5. Taplin signed the Gang Package on December 14, 2023. *Id.*

Approximately two months after his release from prison, Taplin returned to prison for violating the terms of STTL. He was arrested on January 25, 2024 for Delivery of Controlled Substance of selling narcotics to an undercover officer. Defense Exhibit 2, ECF 70-2 at 1. He was not booked, but Parole/Probation Officer ("PO") Matthew Scott required that he report to his

[1] In preparing this order, the final transcript of the hearing is not yet available. Accordingly, this Court cites only to the exhibits to the parties' pleadings. Where facts are referred to without any citation, this Court is relying on the hearing testimony.

office. *Id.* When Taplin did not report as directed, *id.* at 1–3, a warrant was issued on January 30, 2024 for his arrest. *Id.* On February 13, 2024, Taplin was arrested on the STTL warrant after being stopped by law enforcement while driving a car with passengers suspected of retail theft. *Id.* Taplin was taken into custody and returned to prison to complete his prior sentence. *Id.* at 3.

**B. Taplin begins post-prison supervision, but his violations of the terms of his post-prison supervision prompt the imposition of GPS monitoring.**

Following the completion of his sentence, Taplin began his post-prison supervision on April 19, 2024. Taplin had to submit to both General and Special Conditions and sex offender conditions of PPS. General Condition P provides that the person must "[b]e under the supervision of the Department of Corrections and its representatives or other supervisory authority and abide by their direction and counsel." Defense Exhibit 6, ECF 70-6 at 5. Because of his previous crimes, Taplin was classified as Level II Sex Offender Notification Level, pursuant to ORS § 181.800. Accordingly, his PPS conditions included Sex Offender Package A, which included various conditions mandated by Oregon statutes. Defense Exhibit 6, ECF 70-6 at 2. For example, under ORS § 163A.010(3)(a)(B), Taplin was required to report within 10 days any change of residence once he was released to PPS. And, under ORS § 163A.040(4) "[a] person who fails to sign and return an address verification form as required by ORS § 163A.035(4) commits a violation." And, as a sex offender, Taplin had to register annually on the sex offender registration. Defense Exhibit 2, ECF 70-2 at 5. In addition, Taplin was subject to Action Plans from PO Scott that required him to abide by the Gang Package still in effect. ECF 92. As part of his General Supervision Conditions, Taplin was required to permit his PO to visit his residence and he needed to obtain permission from his PO before changing his residence. Defense Exhibit 7, ECF 70-6 at 4. He was also required to obey all laws. *Id.*

Between April 19, 2024, the beginning of his post-prison supervision, and December 18, 2024, Taplin repeatedly violated the terms of his post-prison supervision. For one, he moved residences multiple times without first obtaining permission from his PO and repeatedly failed to register his change of address. Defense Exhibit 2, ECF 70-2 at 5–12. As a result, in multiple instances, his PO was repeatedly unable to verify his residence. Additionally, in August 2024, Taplin missed his annual registration for the sex offender register. *Id.* at 13. In November 2024, PO Scott warned Taplin that if he did not provide a verifiable address within a week, then Scott would put Taplin on GPS. Taplin did not comply with PO Scott's directive.

In response to the probation violations, PO Scott directed Taplin to participate in GPS monitoring. Defense Exhibit 2, ECF 70-2 at 12–13. When Taplin pushed back on having to submit to GPS monitoring, Scott noted his repeated violations and warned that he was at risk of being arrested for failing to register as a Sex Offender. *Id.* at 13. So, Probation completed an Electronic Monitoring Enrollment, specifying that Taplin would begin GPS monitoring. Defense Exhibit 4, ECF 70-4. GPS monitoring began on December 18, 2024 and was to last for a period of 30 days. Government Exhibit 1, ECF 77-1. Following these events, as described below, the Probation Office discussed the GPS data with Detective Koenig. Defendant Exhibit 1, ECF 70-1 at 3.

**C. Cooperation Between Probation and PPB**

While PO Scott was trying to work with Taplin, Probation Officer James Sandberg was cooperating with the Portland Police Bureau ("PPB").

In August 2024, PPB began investigating Taplin for involvement in a drug overdose death. Defense Exhibit 7, ECF 71 at 2-6.[2] By reviewing messages and call logs on the victim's phone, police investigators concluded that Taplin was the first-source suspect. Id. Detective Koenig was assigned to investigate. *Id.* at 1.

Following these events, in October 2024, PPB Detective Koenig reached out to Probation Officer James Sandberg about his concerns that Taplin was involved in drug trafficking. The two began communicating about Taplin. In November 2024, PO Sandberg mentioned that Taplin was set to go back on GPS within the next week. Defense Exhibit 1, ECF 70-1 at 1.

**D. The Portland Police Bureau conducts surveillance of Taplin on January 8, 2025 and consequently, obtains a search warrant.**

On January 8, 2025, PPB officers conducted surveillance of Taplin in the area of NW 21st Street in Portland. Defense Exhibit 7, ECF 71-1 at 6–9. They observed Taplin participate in two hand-to-hand drug deals. *Id.* Following each suspected purchase, the police stopped the suspected buyer, who admitted purchasing crack cocaine and provided Taplin's phone number as the contact information for the source. *Id.*

Based on this information, on January 10, 2025, Detective Koenig obtained a state search warrant for Taplin's person and residence. *Id.* at 1–14. To establish probable cause, he started by providing information about the August 2024 overdose death. *Id.* at 2-10. He then described Taplin's two separate drug deals that had been witnessed on January 8, 2025. *Id.* at 6–9. He also mentioned Defendant's status on post-prison supervision for a crime involving drug dealing. *Id.* at 5–6.

[2] From the testimony at the hearing, it is unclear if PO Scott was aware at this time of the drug overdose investigation in which Taplin was implicated.

**E. The Police Prepare to Arrest Taplin on January 15th.**

On January 15, 2025, PPB officers planned to execute the search warrants that they had previously obtained and advised PO Sandberg of their plans. GPS monitoring by PO Sandberg that day showed that Taplin was around the North Park Blocks at 12:30 p.m. and then returned to the location where he was then believed to be residing at 120 NW 21st Avenue. Initially, Detective Koenig received a call from PO Sandberg, who was monitoring Taplin's GPS. While the officers were en route to Taplin's location, PO Sandberg updated Detective Koenig that Taplin had returned to his residence.

Around 3:00 PM, Detective Koenig observed a person resembling Taplin exit the building and get into a black Chevy 4 door vehicle. Officers followed the Chevy and Probation Officer Sandberg confirmed that Taplin's GPS was moving consistently with the vehicle. Taplin briefly got out of the Chevy at NW 9th and NW Everett. Then, the Chevy proceeded to the area of NE Alberta, where Taplin got out and went into a shop in the area.

**F. Taplin's Encounter with the Police**

PPB officers prepared to detain Taplin when he returned to the Chevy. When Taplin returned to the Chevy, officers attempted to detain him. Special Agent Clay Othic got out of his vehicle and shouted, "Police, don't move!" In response, Taplin froze before running away from the police.

While being chased, Taplin turned into an alley. When he rounded a corner into the alleyway, he almost immediately collided with Officer Baer, who was parked in the alley but was out of his car to set up spike strips. Officer Baer testified credibly at the hearing that this collision was wholly unintentional. Following the collision, Taplin turned around, ran the other way, and threw a firearm over Officer Baer's head. After throwing it, he immediately submitted to the other officers chasing him.

### G. Relevant Procedural History

Taplin was indicted on February 11, 2025 for the crime of being a felon in possession of a firearm. Indictment, ECF 1. On May 28, 2026, Taplin filed a Motion to Suppress the Firearm, Mot., ECF 59. On July 2, 2026, Taplin filed a Supplemental Motion to Suppress, ECF 70. His two motions contend that the GPS location monitoring that PO Scott imposed on him was a search in violation of the Fourth Amendment and that consequently, the firearm must be suppressed.

On September 15, 2026 and September 16, 2026, this Court held a hearing on the Motion to Suppress. ECF 91, 93. PPB Officer David Baer, PPB Officer Benjamin Harris, Multnomah County Community Justice Manager Carl Green, Parole/Probation Officer Matthew Scott, Parole/Probation Officer James Sandberg, and PPB Detective Jason Koenig all testified and were subject to cross-examination. This Court took the motions under advisement following the hearing.

## DISCUSSION

The Fourth Amendment, both on its own against the Federal Government and as incorporated against the States by the Fourteenth Amendment, prohibits "unreasonable searches and seizures." U.S. Const. amend IV; *Mapp v. Ohio*, 367 U.S. 643, 650 (1961). So, this Court starts with a point of agreement between the parties: the GPS monitoring of Taplin was a search under the Fourth Amendment. In *Grady v. North Carolina*, 575 U.S. 306 (2015), the Supreme Court held that "a State also conducts a search when it attaches a device to a person's body, without consent, for the purpose of tracking that individual's movements." *Id.* at 309. As it must, the Government largely concedes this point. *See generally* Response, ECF 55.

So, the question becomes whether the GPS monitoring was a reasonable search under the Fourth Amendment and if so, whether suppression is appropriate as a remedy. The Government prevails on both points.

**A. The GPS Search and the Fourth Amendment**

The starting point for the reasonableness analysis is the parolee/probationer exception to the warrant requirement. Warrantless searches are *per se* unreasonable subject to a few exceptions. *Arizona v. Gant*, 556 U.S. 332, 338 (2009). One such exception is the parolee/probationer exception, where probationers and parolees do not enjoy the "absolute liberty to which every citizen is entitled." *Samson v. California*, 547 U.S. 843, 848–49 (2006). Given Taplin's undisputed status as a person on post-prison supervision subject to certain conditions, his status is relevantly similar such that this exception would appear to apply. Defense Exhibit 6, ECF 70-6 at 5.

To contend that the GPS search was unreasonable, Taplin offers arguments from both federal and state law. Neither body of law provides a basis for concluding that the GPS search was unreasonable. But, this Court starts with a gateway issue relevant to both bodies of law: whether Probation Officer Scott had reasonable grounds to conclude that GPS monitoring would reveal a violation of the terms of Taplin's post-prison supervision.

1. **Probation Officer Scott had reasonable grounds and therefore reasonable suspicion for the GPS monitoring.**

Whether a law enforcement agent's search is suspicionless matters under both federal Fourth Amendment law and Oregon law. As this Court will explain in more detail below, if the GPS search was suspicionless, then Taplin would come closer to establishing that the GPS search violated both the Fourth Amendment and Oregon law. Many of the precedents cited by Taplin concern suspicionless searches, so their relevance turns on whether the search here was

suspicionless. But, if the GPS search was not suspicionless, then Taplin's arguments lose much of their force.

So, this Court turns to the relevant standards for whether a search is suspicionless under federal Fourth Amendment law and Oregon law. Under federal Fourth Amendment law, it matters whether a search is undertaken with reasonable suspicion. *Terry v. Ohio*, 392 U.S. 1, 21 (1968). Reasonable suspicion requires "specific and articulable facts" leading the law enforcement officer to conclude that the probationer "committed a probation or release violation, and that a search of the probationer's person, residence, vehicle, or property would disclose evidence of the violation." *State v. Canepa*, 313 Or. App. 348, 352 (2021) (cleaned up). Oregon state law's "reasonable grounds" standard goes beyond that to require the officer "to identify the specific violation suspected, rather than have a mere hunch that the person has engaged in generally criminal activity." *Id.*

Here, Probation Officer Scott had reasonable grounds for requiring Taplin to undergo GPS monitoring. To start, Taplin was returned to prison for repeatedly violating the terms of his STTL. *See* Background, Section A. While this is not sufficient, it is relevant context for what followed as it demonstrated that Taplin was a high-risk for PPS violations.[3] After release, Taplin repeatedly failed to abide by the terms of his probation. *See id.*, Section B. Probation Officer Scott was unable to complete a home visit since Taplin was released from prison eight months

[3] The Defense objects to the use of the August overdose death as justification for the GPS search. Reply ISO Motion to Suppress ("Reply"), ECF 80 at 20. Because the Government has not provided discovery regarding the August 2024 overdose death, it cannot use that the August 2024 death to justify the search. *Id.* However, the conclusion does not follow from the premise. Just because the August overdose investigation materials do not satisfy "a threshold showing of materiality," Order Denying Pro Se Motion to Compel, ECF 60 (quoting *United States v. Stever*, 603 F.3d 747, 752 (9th Cir. 2010)), does not mean that the August overdose investigation cannot support a finding of reasonable grounds. In any event, this Court primarily relies on the failure to notify of address change violations as well as Taplin's background history of PPS violations.

earlier. *Id.* In addition, in August 2024, Taplin had missed his annual registration for the sex offender register. *Id.* This evidence pertains to the "specific violation[s] suspected," including failure to report a change of address. *Canepa*, 313 Or. App. at 352.

At the hearing, Defendant pointed out that PO Scott did not attempt a home visit until December 26, 2024, and that PO Scott had said that he was in substantial compliance with the terms of his PPS. These observations do not carry much weight because neither the "reasonable suspicion" nor the "reasonable grounds" standards impose a narrow tailoring requirement on probation searches. *See id.* Perhaps, PO Scott could have conducted a home visit at an earlier time. And perhaps, he could have been stricter regarding Taplin's violations. But, as he testified credibly at hearing, he was trying to be generous with Taplin and give Taplin time to establish himself. That generosity is not a reason that he could not later impose GPS because Taplin was in technical violation the whole time by not notifying him of his address changes. With his high caseload, Scott had to make difficult decisions about how to balance the State's interests in Taplin's rehabilitation and in the safety of the community. His willingness to change his mind and decide to impose GPS after a prolonged period of technical violations supports, rather than undermines, the reasonableness of his grounds for the GPS search.

**2. The GPS monitoring was reasonable under federal Fourth Amendment law.**

Taplin contends that the GPS monitoring here violated federal Fourth Amendment precedent regarding the parolee/probationer exception. Relying on *Samson* and *Cervantes*, Taplin contends that the GPS monitoring was impermissible because of a) the absence of a clear and unambiguous search condition; b) Taplin's lack of notice of it; and c) the search was arbitrary and capricious. Supp. Mot., ECF 70 at 6–7, 32.

This Court is unpersuaded. For one, Taplin had clear and unambiguous notice of the search condition. To start, the Gang Package clearly communicated that Taplin can be subject to

GPS. Defense Exhibit 5, ECF 70-5.[4] In addition, PO Scott clearly communicated the GPS monitoring directive in December of 2024 so he did not lack notice. *See* Background, Section B. True, the GPS directive was first clearly expressed by PO Scott, not the Parole Board. But, *Samson* did not specify the level of state bureaucracy that must communicate the clear and unambiguous terms of the search condition. *See generally* Samson, 547 U.S. 843. Nothing in the Fourth Amendment's text or in Supreme Court or Ninth Circuit precedent dictates that PO Scott could not be the one to do so.

More fundamentally, even if Taplin was correct about the requirements of *Samson* and *Cervantes*, he makes two major errors about the situations where those cases apply. To start, Taplin neglects to mention that both of those cases dealt with the constraints on *suspicionless* searches. *Samson*, 547 U.S. at 846; *Cervantes*, 859 F.3d 1175, 1178 (9th Cir. 2017). With such searches, the list of constraints identified by Taplin is far more necessary. But here, given the more than reasonable grounds for GPS monitoring, the need for an extensive checklist of constraints for the Government is unwarranted.[5]

In addition, Taplin seeks to replace the flexible balancing test from *Samson* and *Cervantes* with a checklist. *Samson* speaks extensively of the need for "balancing" and identifies the factors listed as "salient," but not dispositive, in determining whether a given search was reasonable. 547 U.S. at 849, 852. *Cervantes* adopted a similar approach. *See* 859 F.3d at 1182 (comparing the defendant's privacy interests with the State's legitimate interests). Defendant's

---

[4] At the hearing, Defendant argued that the Gang Package had expired. Defense Exhibit 5, ECF 70-5. But, the expiration date of the PPS conditions from which it was derived was clear: March 1, 2027. Defense Ex. 3., ECF 70-3.

[5] For similar reasons, any requirement that a search not be "arbitrary and capricious" is met. Supp. Mot., ECF 70 at 20, 32. A search based on reasonable grounds is not arbitrary and capricious.

Motion adopts a different approach, listing out the factors identified by *Samson* and *Cervantes* as iron-clad requirements. Supp. Mot, ECF 70 at 20–21. Here, that difference in approaches makes a difference in outcome: unlike in *Samson* and *Cervantes*, the GPS search was based on reasonable grounds, so the overall calculus favors the conclusion that the search was reasonable.

**3. Taplin's Oregon state law arguments are unpersuasive.**

Unable to rely on federal Fourth Amendment precedent, Taplin offers an argument based on state law. Taplin claims that state law shapes the nature of a person on post-prison supervision's reasonable expectation of privacy. Supp. Mot., ECF 70 at 20. From that premise, Taplin charges that Probation and PPB committed a variety of Oregon state law violations. *Id.* at 22–32. Those Oregon law violations, the argument goes, amount to violations of the Fourth Amendment. *Id.*

Taplin's argument fails at both steps. An Oregon law violation does not necessitate a violation of the Fourth Amendment. Even if it did, law enforcement's conduct here fully complied with Oregon law.

**a. Oregon state law does not alter the meaning of the Fourth Amendment in Oregon.**

To start, a state law violation by a law enforcement agent does not imply a Fourth Amendment violation. The Fourth Amendment, the Ninth Circuit has explained, is "a quintessentially federal standard whose protections do not vary from jurisdiction to jurisdiction." *United States v. Steinman*, 159 F.4th 550, 572 (9th Cir. 2025). This point is not new; "'whether or not a search is reasonable within the meaning of the Fourth Amendment' ... has never 'depend[ed] on the law of the particular State in which the search occurs.'" *Id.* (quoting *Virginia v. Moore*, 553 U.S. 164, 172 (2008) (cleaned up)). So, for instance, "even if state law makes clear that a misdemeanor is not an arrestable offense, '[i]f an officer has probable cause to

believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.'" *Id.* (quoting *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001)). Applied here, that means that any Oregon state law violations are irrelevant to whether the GPS search complied with the Fourth Amendment.

To escape this conclusion, Taplin must contend that the parolee/probationer exception is different. The Ninth Circuit's decision in *Cornel v. Hawaii*, 37 F.4th 527 (9th Cir. 2022) forecloses that position. There, Plaintiff, a parolee, brought a Section 1983 suit, alleging that "her arrest violated the Fourth Amendment." *Id.* at 531–32. In relevant part, Plaintiff contended that her arrest violated Hawai'i law because "the parole office could only suspend her parole if her whereabouts were not known because of her neglect." *Id.* at 533–34. The Ninth Circuit rejected this argument, "hold[ing] that Cornel's arrest was reasonable under the Fourth Amendment despite the parole office's possible violation of the Hawai'i Penal Code." *Id.* at 534.

Nor do *Samson v. California*, 547 U.S. 843 (2006) or *United States v. Cervantes*, 859 F.3d 1175 (9th Cir. 2017) support Taplin's position. To be sure, both decisions consulted state law to confirm that probationers and parolees had a reduced expectation of privacy. *See Samson*, 547 U.S. at 851; *Cervantes*, 859 F.3d at 1183. But that is a far cry from the principle that state law violations necessarily imply a Fourth Amendment violation in the probationer/parolee context. And to the extent that these decisions generated any uncertainty, *Cornel* has since clarified that state law violations do not render a parolee/probationer search unreasonable under the Fourth Amendment. *Cornel*, 37 F.4th at 534. Simply put, "state law [does] not alter the content of the Fourth Amendment," *Steinman*, 159 F.4th at 572.

**b. The GPS monitoring did not violate Oregon law.**

Even if a violation of Oregon state law could imply a Fourth Amendment violation, law enforcement's conduct here fully complied with Oregon state law.

**i. General Condition P authorized the GPS search.**

Defendant contends that the probation officer was not permitted to impose GPS monitoring. Defendant's argument proceeds in the following manner: There are a variety of general conditions of post-prison supervision. Supp. Mot., ECF 70 at 23–26. None of those conditions explicitly mentions GPS monitoring. *Id.* So, GPS monitoring must be a special condition of supervision, and special conditions must be approved by the Board of Parole and Post-Prison Supervision, not the parole officer. *Id.* at 26. Because such approval was not sought here, the GPS monitoring was unlawful.

The Government's rejoinder relies on General Condition P, which provides that a person on post-prison supervision must "[b]e under the supervision of the Department of Corrections and its representatives or other supervisory authority and abide by their direction and counsel." Response, ECF 77 at 28. That condition, the Government contends, permits a probation officer to direct GPS monitoring. *Id.* And because GPS monitoring was a directive pursuant to a General Condition, not a condition itself, Defendant's caselaw about the specific process for and the limitations on the imposition of special conditions is inapplicable. *Id.* at 27. The Government is correct.

General Condition P's text illustrates that it can cover GPS monitoring directives. It requires those under PPS to "[b]e under the supervision of the Department of Corrections and its representatives or other supervisory authority and abide by their direction and counsel." Defense Exhibit 6, ECF 70-6 at 5. General Condition P uses a variety of words and phrases with broad meanings like "supervision," "abide," and "direction and counsel." SUPERVISION, Black's Law Dictionary (12th ed. 2024) ("The series of acts involved in managing, directing, or overseeing persons or projects"); DIRECTION, Black's Law Dictionary (12th ed. 2024) ("1. The course taken in relation to the point toward or away from which something or someone is moving; a

point to or from which a person or thing moves); COUNSEL, Black's Law Dictionary (12th ed. 2024) ("1. Advice or assistance; opinion given as the result of consultation."). GPS monitoring was a type of "direction and counsel" that General Condition P permits a probation officer to give. So, the GPS monitoring directive fits comfortably within General Condition P.

In addition, deference to the Board of Parole and Post-Prison Supervision also backs the Government's interpretation. The Board's "interpretation of its own rule is entitled to judicial deference 'if that interpretation is plausible given the wording of the rule, its context, and any other source of law.'" *Hessel v. Bd. of Parole & Post-Prison Supervision*, 350 Or. App. 451, 455–56 (2026) (cleaned up). Here, the November 14, 2023 Board memorandum, whose interpretation Taplin does not dispute, states that GPS monitoring is a valid directive in accordance with General Condition P. Government Exhibit 2, ECF 77-2 at 11. And, given the textual analysis above, GPS monitoring pursuant to General Condition P is at least plausible. For that reason, this Court would, if it needed to, defer to the Board's guidance.[6]

In response, Taplin points to other statutes and conditions of probation that permit the use of GPS. *See* Reply, ECF 80 at 14 (discussing ORS 144.103, which authorizes GPS tracking of persons convicted of sex crimes against children under the age of 12). "If the legislature believed General Condition P authorized probation officers to require GPS tracking," Taplin insists, "it would not have needed to expressly authorize GPS tracking for serious sex offenders in the later stage of supervision." *Id.*

---

[6] It is no answer to point out that "a state court's interpretation of its statutes is binding on the federal courts unless a state law is inconsistent with the Federal Constitution." *See* Reply, ECF 80 at 14 (quoting *United States v. Ramos*, 39 F.3d 219, 220 (9th Cir. 1994)). Given that Oregon state courts would give deference to the Board of Probation and Post-Prison Supervision, a proper respect for the Oregon state courts requires deference to the Board.

Taplin's redundancy argument carries some weight, but is far from dispositive. "Sometimes the better overall reading of the statute contains some redundancy." *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019). The same can be said of the overall statutory scheme. Oregon's legislature is certainly entitled to "use a 'belt and suspenders approach' to dispel any doubt about [the statutory scheme's] scope." *United States v. Myers*, 170 F.4th 1180, 1188 (9th Cir. 2026). Here, given the breadth of the statutory text, the deference due to the Board of Parole and Post-Prison Supervision, and the weighty governmental interests in "integrating [those on post-prison supervision] back into the community and combating recidivism," S*amson,* 547 U.S. at 849, this Court concludes that the legislature took that approach.

In addition, Taplin reasons by analogy from probation cases from the Oregon state courts. For instance, in *State v. Hardges*, 294 Or. App. 445 (2018), the Oregon Court of Appeals interpreted the probation condition, "[r]eport as required and abide by the direction of the supervising officer." *Id.* at 451 n. 2. Relying on the interpretative principle that "the meaning of words in a statute may be clarified or confirmed by reference to other words in the same sentence or provision," the *Hardges* court concluded that the probation condition only permitted directives generally related to the reporting requirement. *Id.* at 450–51. Accordingly, the condition did not cover the probation officer's requirement that the probationer stay "at the Medford Building" since that directive was not generally related to a probationer's "reporting requirements." *Id.* at 452. Taplin, without citing a case, argues that General Condition P should not be interpreted differently. Reply, ECF 80 at 11–12.

That last logical leap, however, is the problem for Taplin because here, a difference in text necessitates a difference in interpretation. *Hardges*' core insight was that the general probation language about supervision was limited by other proximate language about reporting.

*Hardges*, 294 Or. App. at 451. By contrast, General Condition P contains no reporting requirement, so the same interpretative move is unavailable. Far from supporting Taplin's position, *Hardges* undermines it.

In sum, as shown by text and Board interpretation, General Condition P readily authorizes GPS monitoring. Taplin's arguments fail to grapple with the specifics of General Condition P and so are without merit.

**ii. Taplin was given a reasonable opportunity to refuse the search.**

Next, Taplin contends that he was not given a reasonable opportunity to refuse the search. That is not true.

Defendant correctly points out that under Oregon law, "a person on probation or post-prison supervision may refuse to submit to a search sought pursuant to a search condition." Mot., ECF 70 at 22. "If the probationer refuses to submit to such a search, then the officer has no authority, under the terms of the search condition, to conduct a warrantless search. The refusal may, however, violate the terms of the probation and could provide grounds for revocation of the probation." *State v. Davis*, 133 Or. App. 467, 473 *rev. den.*, 321 Or 429 (1995). So, the critical question is whether the probationer had a "reasonable opportunity" to refuse the search. *State v. Wammack*, 228 Or. App. 520, 524 (2009). The Government bears the burden to show that the Defendant had that reasonable opportunity. *State v. Tennant*, 310 Or. App. 70, 77 (2021) (cleaned up). In analyzing this question, courts "view the situation from the perspective of the person being asked for consent, not the police officer asking." *Id.* at 76. And Oregon courts give "considerable weight to whether the officer 'correctly informed defendant that he could refuse to consent to a search, while noting that such a refusal could subject him to arrest for a probation violation.'" *Id.* at 77 (cleaned up).

In applying the "reasonable opportunity" standard, Oregon courts have held that while acquiescence is not "always a consent to search," "it may constitute consent under certain circumstances." *Wammack*, 228 Or. App. at 524 (cleaned up). In *State v. Davis*, 133 Or. App. 467 (1995), for instance, the defendant "knew that he had agreed to submit to reasonable searches by [the probation officer], upon penalty of revocation of his probation." *Id.* at 475. The defendant had allowed "himself to be caught with marijuana." *Wammack*, 228 Or. App. at 524 (characterizing *Davis*, 133 Or. App. at 476). The Court concluded that defendant had not "merely" acquiesced to a showing of police authority. *Davis*, 133 Or. App. at 476. "Rather, defendant did exactly what he was required to do to remain in compliance with the terms of his probation: He submitted to a reasonable search of his premises by his probation officer." *Id.* "Other than the pressure on defendant not to violate the terms of his probation," the *Davis* court held, "there was nothing coercive about the circumstances." *Id.*

By contrast, the Oregon Court of Appeals decision in *State v. Tennant*, 310 Or. App. 70 (2021) illustrates what it looks like for a probationer to lack a reasonable opportunity to consent. There, Defendant "was presented with two parole and probation officers who, upon entering his home, immediately began questioning both himself and his girlfriend." *Tennant*, 310 Or. App. at 77–78. They also "immediately observed drug paraphernalia." *Id.* at 78. The probation officer knew that the defendant, a probationer, was operating under the "the mistaken belief that defendant's probationary status required him to consent to a search[.]" *Id.* The law enforcement agent admitted that "his request to enter defendant's room was [a] formality." *Id.* Finally, "the state offered no testimony that [the probation officer] ever informed defendant that he could refuse consent or limit the scope of consent." *Id.* at 79. Under these conditions, the Oregon Court of Appeals found the State did not meet its burden to show a reasonable opportunity to consent.

Here, the Government has met the burden to show a reasonable opportunity to refuse consent. To start, the Gang Package signed by Taplin in December 2023 clearly set forth GPS as a condition for him to agree to. In addition, the second imposition of GPS also shows that reasonable opportunity. In response to Taplin's post-prison supervision violations such as missing his annual registration for the sex offender registry, PO Scott directed Taplin to find a verifiable residence within a week, or PO Scott would put him on GPS monitoring. When that did not occur within the specified time-frame, PO Scott ordered Taplin to participate in GPS monitoring. *See* Background, Section B. Although Taplin pushed back initially, PO Scott warned that he could be arrested for his various violations. *Id.* PO Scott did not invade Taplin's home nor was his testimony at the hearing consistent with the search request being just a "formality." *Tennant*, 310 Or. App. at 78. In light of these circumstances, there was nothing more coercive than the "pressure on defendant not to violate the terms of his [post-prison supervision]." *Davis*, 133 Or. App. at 476. Thus, Taplin had a reasonable opportunity to refuse the GPS monitoring.

**iii. The police acted as agents of the probation officer.**

Next, Taplin contends that the police improperly failed to act as agents of the probation officer. This Court disagrees.

To start, Taplin is correct under Oregon law "a search condition is permissible only if any search is under the direction or control of the probation officer." Supp. Mot., ECF 70 at 30 (citing *State v. Age*, 38 Or. App. 501 (1979)). But, none of Defendant's cases sets out a test for what a police officer must do to be an "agent" in this context. *See, e.g., State v. Jones*, 36 Or. App. 271, 274 (describing such an "agency" requirement, but not identifying a test for it). Defendant claims that this "agency" argument goes to a Fourth Amendment violation. So, in the absence of a state court "agency" test, this Court will apply the ultimate touchstone of Fourth

Amendment analysis, reasonableness, and ask whether Probation exercised reasonable direction or control over the police. *See Grady*, 575 U.S. at 310; *Samson*, 547 U.S. at 843.

Here, the Probation Office exercised reasonable direction or control over the police officers. PO Scott directed the GPS monitoring independently. PO Sandberg made the decision to share location information obtained from such monitoring with local law enforcement on January 15, 2025. He retained control over any information from GPS. *See* Background, Section B. No evidence in the record demonstrates that probation could not have refused to turn it over at any time. *Id.* Detective Koenig and PO Sandberg testified credibly that neither PO Scott nor PO Sandberg were ever ordered by PPB to impose GPS. Accordingly, to the extent that an Oregon state law constraint applies, it is met here.

**iv. Taplin's remaining objections to the formatting of the Probation Action Plan are without merit.**

As a last resort, Taplin isolates a series of formatting defects with the action plan. He notes that the Action Form was a) unsigned and b) that it set out a 30-day period. Reply, ECF 80 at 15–16. While not ideal, these defects do not establish a violation of Oregon law.

Start with the signature. Taplin fails to show why a signature was legally necessary. Taplin does not deny that he was aware of the GPS monitoring as a directive pursuant to the terms of his post-prison supervision. As for the time period, Taplin does not deny the time period for GPS monitoring did not exceed 30 days. So, even if there was a legal limit of 30 days, the GPS monitoring from December 18, 2024 to January 15, 2024 complied with that limit. Electronic Monitoring Enrollment Form, ECF 70-4. The fact that the start date on the form was incorrect does not negate that the GPS monitoring complied with any legal limits.

**B. Abandonment**

Even if this Court concluded that the GPS monitoring violated the Fourth Amendment, Taplin's abandonment of the firearm precludes suppression. That abandonment means that Taplin lacked a reasonable expectation of privacy in the firearm. For that reason, the abandoned firearm provides independent probable cause for Taplin's arrest, meaning that the cash and drugs found on Taplin are admissible under the search incident to arrest doctrine.

Voluntary abandonment precludes a defendant's Fourth Amendment claim. "Because warrantless searches or seizures of abandoned property do not violate the fourth amendment, persons who voluntarily abandon property lack standing to complain of its search and seizure." *United States v. Nordling*, 804 F.2d 1466, 1469 (9th Cir. 1986). Abandonment, the Ninth Circuit has explained, "is a question of intent." *United States v. Fisher*, 56 F.4th 673, 686 (9th Cir. 2022). The relevant inquiry is "whether, through words, acts or other objective indications, a person has relinquished a reasonable expectation of privacy in the property at the time of the search or seizure." *Id.* (cleaned up). By throwing away the firearm, his voluntary acts "relinquished a reasonable expectation of privacy in the property." *Fisher*, 56 F.4th at 686; *see also United States v. Baker*, 58 F.4th 1109, 1118 (9th Cir. 2023) (explaining that "physical relinquishment of the property" is important evidence of abandonment).

In response, Defendant argues that Taplin was seized before the purported abandonment and therefore, the "purported abandonment was not voluntary." Reply, ECF 80 at 6. Accordingly, the arrest was without probable cause and the drugs and cash are inadmissible based on the search incident to arrest doctrine. *Id.* at 21. Both contentions are without merit.

### 1. Officer Baer did not seize Taplin and any seizure did not result in the abandonment.

Taplin's primary line of argument relies on the "mere physical touch rule" that the Supreme Court set forth in *Torres v. Madrid*, 592 U.S. 306 (2021). Taplin argues that when he turned into the alley and ran into Officer Baer, the two made physical contact. Reply, ECF 80 at 8–10. Such physical touch, Taplin argues, constitutes a seizure under Supreme Court precedent. *Id.* And because Taplin was seized when he ran into Office Baer, he was still seized when he abandoned the firearm afterwards. *Id.* And because he was seized when he abandoned the firearm, there was a necessary "nexus" between a Fourth Amendment violation and the abandonment. *Id.*

This Court finds this theory unpersuasive for several independent reasons. Mere physical contact does not suffice for a Fourth Amendment seizure. The physical contact must be an "application of physical force" that "objectively manifests an intent to restrain." *Torres,* 592 U.S. at 317–18. Officer Baer's conduct does not meet that test. Even if the physical contact here was a seizure, that seizure ended when Taplin ran away from Officer Baer. Even if Taplin was seized when he abandoned the firearm, that abandonment did not result from the seizure, precluding the necessary nexus. In sum, the alleged seizure by Officer Baer does not taint Taplin's abandonment of the firearm.

#### a. The History of the Mere Physical Touch Rule

To understand the mere physical touch rule upon which Defendant relies, it is worthwhile to chart its modern history. While Defendant is correct that that rule's modern iteration begins with dicta in *California v. Hodari D.*, 499 U.S. 621 (1991), it did not end there. Rather, in its holding in *Torres v. Madrid*, 592 U.S. 306 (2021), the Supreme Court clarified the limits of that doctrine. And those limits, in turn, reveal the inapplicability of that doctrine here.

Dicta in *Hodari D.* laid the groundwork for the mere physical touch rule. There, police officers pursued the defendant. *Hodari D.*, 499 U.S. at 623. During the chase, the defendant discarded a rock of what "was found to be crack cocaine." *Id.* at 623. The officer subsequently tackled the defendant. *Id.* In his motion to suppress, the defendant argued that he was seized when the officers chased him. *Id.* The Court disagreed, reasoning that a show of authority by police absent submission by the suspect did not qualify as a seizure. *Id.* at 625–26. Because the defendant had not submitted when he dropped the rock of crack cocaine, he was not seized, precluding defendant's argument. *Id.* at 629.

In addition to resolving the case before it, the *Hodari* Court offered dicta that would form the basis for the physical touch rule. "[T]he mere grasping or application of physical force with lawful authority, whether or not it succeeded in subduing the arrestee, was sufficient" for a seizure. *Id.* at 624. And that language was dicta because the case before the Court did "not involve the application of any physical force." *Id.* at 625.

*Hodari D.*'s dicta became a holding in *Torres*. In that Section 1983 case, the officers "fired" at the Plaintiff, striking her "twice in the back." *Torres*, 592 U.S. at 310. Despite this, she continued to drive away. *Id.* So, the case put the *Hodari D.* dicta directly at issue: was there a Fourth Amendment seizure as a result of the application of physical force even though the suspect did not submit?

The Supreme Court in *Torres* said yes. The Court traced its conclusion to the "common law rule. . .that the application of force gives rise to an arrest, even if the officer does not secure control over the arrestee." *Id.* at 313. And in analyzing the history, the Court offered various examples, the "laying of hands" and the touch of an "end of [one's] finger," that all involved the

application of physical force. *Id*. And when such an application of physical force occurs, it is a seizure even if the suspect does not submit. *Id.*

Yet, even as the Supreme Court laid out its holding, it also identified its limits. "[T]he common law rule does not transform every physical contact between a government employee and a member of the public into a Fourth Amendment seizure." *Id.* at 317. Rather, "[a] seizure requires the use of force *with intent to restrain*." *Id.* Two limits arising from that principle are worth mentioning. First, "accidental force" does not qualify as a seizure. *Id.* Second, "a seizure by force—absent submission—lasts only as long as the application of force." *Id.* at 318.

**b. The physical contact between Taplin and Officer Baer was not a seizure.**

Each of the limits set forth by *Torres* reveal why Taplin's physical contact with Officer Baer was not a seizure. To start, there was no "application of force." As shown by the body camera footage introduced by Defendant and Officer Baer's testimony at the hearing, Taplin ran into Office Baer when he ran around the corner and into the alley. Exhibit 8, ECF 81 at 00:24 seconds – 00:30. As Officer Baer put it, it was in the manner of a schoolyard accident. Even if there was physical contact between the two, Office Baer did not apply force. For the same reasons, any physical contact between the two was "accidental." *Torres*, 592 U.S. at 317.

While it is somewhat unclear, Taplin appears to suggest that any physical touch (even absent an application of physical force) qualifies as a seizure. Reply, ECF 80 at 8. To be sure, both *Hodari D.* and *Torres* refer to a mere touch rule. If certain language in those opinions was read in isolation, then it is possible that it could justify the breadth of Taplin's proposed rule.

But, such a reading would adopt a flawed acontextual approach to interpreting judicial opinions. The Supreme Court has cautioned that "the language of an opinion is not always to be parsed as though we were dealing with language of a statute." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979). Accordingly, judicial opinions "must be read with a careful eye to context."

*Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023); *see also Olivier v. City of Brandon, Mississippi*, 607 U.S. 552, 565 (2026) (cleaned up) ("[G]eneral language in judicial opinions should be read as referring in context to circumstances similar to [those] then before the Court[.]"). Taplin's argument raises the question of what context shows here.

Here, context counsels that physical contact absent an application of force is not a seizure. Both *Hodari D.* and *Torres* concerned circumstances—a tackle and a police shooting respectively—where the physical contact arose from an application of force. *Torres*, 592 U.S. at 313; *Hodari D.*, 499 U.S. at 624; *cf. Olivier*, 607 U.S. at 565 (looking to examples to uncover the scope of the Supreme Court's decision in *Heck v. Humphrey*, 512 U.S. 477 (1994)). And both *Hodari D.* and *Torres* echoed historical examples such as the laying of hands that indicated the application of force. *Torres*, 592 U.S. at 313; *Hodari D.*, 499 U.S. at 624. And, *Torres* is additionally explicit that "accidental" physical contacts do not suffice for a seizure. *Torres*, 592 U.S. at 318. Read in context, these cases do not support Defendant's broader rule. Thus, Officer Baer did not seize Taplin prior to the abandonment.

**c. Any seizure ended when Taplin ran away from Officer Baer.**

Even if Officer Baer seized Taplin, that seizure ended when Taplin ran away from Officer Baer. "[A] seizure by force—absent submission—lasts only as long as the application of force." *Id.* at 318. Here, the firearm was only thrown away or abandoned, after the physical contact with Officer Baer ended. And, Taplin only submitted to the police after the abandonment in question. So, Taplin was not seized by Officer Baer when he abandoned the firearm.

Instead of discussing *Torres*, Taplin proposes a different rule, relying on *Hodari D.* "[I]f an officer physically contacts a suspect who then breaks away and escapes for some appreciable time and distance, the suspect is no longer 'seized' during that 'period of fugitivity.'" Reply, ECF 80 at 8. But, this "appreciable time and distance" rule is not just nowhere in *Hodari D.* It is

also flatly inconsistent with *Torres*; "a seizure by force—absent submission—lasts *only* as long as the application of force." *Torres*, 592 U.S. at 318 (emphasis added). Therefore, Taplin was not seized at the time of abandonment.

**d. Even if Taplin was seized when he abandoned the firearm, that abandonment did not result from the seizure.**

Even assuming that Taplin was seized when he abandoned the firearm, it does not follow that the abandonment "result[ed]" from a seizure. *United States v. Stephens*, 206 F.3d 914, 917 (9th Cir. 2000) ("The next question is whether Stephens abandoned the bag as a result of an unlawful seizure."). Even if someone is seized, it does not follow that everything they do when seized is a product of that seizure. Officer Baer's inadvertent physical contact with Taplin in no way required him to throw away the firearm. So, the necessary "nexus" required by Ninth Circuit precedent is absent here. *United States v. Gilman*, 684 F.2d 616, 620 (9th Cir. 1982).

**2. Because the abandoned firearm is admissible, the cash and drugs are also admissible.**

The remaining question is whether the cash and drugs found on Taplin after his arrest are admissible. The answer is yes.

The search incident to arrest doctrine is an exception to the general rule against warrantless searches. *United States v. Hudson*, 100 F.3d 1409, 1419 (9th Cir. 1996). As a result of a valid arrest, law enforcement agents may conduct a search that "is limited to the arrestee's person and to the area 'within his immediate control,' meaning 'the area from within which he might gain possession of a weapon or destructible evidence.'" *Id.* (cleaned up).

Here, the Government contends that the abandoned firearm provides independent probable cause for Taplin's arrest. Law enforcement, all agree, knew Taplin was a felon. If they saw him relinquish the firearm, they would have probable cause, a "fair probability," that he was a felon in possession of a firearm. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). So, they could

arrest him, search him incident to arrest, and seize the cash and drugs. Taplin's sole response is that the GPS search tainted the abandonment of the firearm. Reply, ECF 80 at 21. For all the reasons described previously, that argument fails, so the drugs and cash are admissible under the search incident to arrest doctrine.[7]

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Suppress, ECF 59, and Supplemental Motion to Suppress, ECF 70, are DENIED.

**IT IS SO ORDERED.**

DATED this 28th day of September, 2026.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

[7] The cash and drugs are also independently admissible because the police obtained a warrant for the search of Taplin's person. *See generally* Defense Exhibit 7, ECF 70-6. So, the police were permitted to search him pursuant to that warrant and seize the drugs and cash.